# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

—————————————————————————— )
)
**PRIMARQUE PRODUCTS CO. INC.,** )
       **Plaintiff,** )
)
)        **CIVIL ACTION**
**v.** )        **NO. 15-30067-TSH**
)
)
**WILLIAMS WEST & WITTS PRODUCTS COMPANY,** )
**d/b/a INTEGRATIVE FLAVORS,** )
       **Defendant.** )
—————————————————————————— )

## ORDER AND MEMORANDUM OF DECISION
### March 29, 2018

**HILLMAN, D.J.**

## Background

Plaintiff, Primarque Products Co. Inc. ("Plaintiff" or "Primarque") has filed claims against Defendant, Williams West & Witts Products Company d/b/a Integrative Flavors ("Defendant" or "WWW") alleging claims for Breach of Contract (Count I), Promissory Estoppel (Count II), Intentional Interference with Business Relations (Count III), and violation of the Massachusetts Consumer Protection Act, Mass.Gen.L. ch. 93A ("Chapter 93A")(Count IV). WWW has filed a Counterclaim against Primarque alleging a claim for breach of contract (Count I). This Memorandum and Order of Decision addresses Defendant/Counter-Claimant Williams West & Witt's Products Company d/b/a Integrative Flavors' Motion for Summary

Judgment (Docket No. 129).  For the reasons set forth below, that motion is **granted**, in part and **denied**, in part.[1]

## <u>Facts</u>

### *The Parties' Relationship*

WWW is a soup base manufacturer and Primarque is a former distributor of WWW's soup base products. Jack Barron ("Barron") is Primarque's current owner and president. In 1986, Barron acquired Primarque from his father, Selwyn Barron, who owned and operated Primarque from its inception.  Dorothy Palmer ("Dorothy") and Victor Palmer owned and operated WWW between October 1, 1981 and September 15, 2005. Georgeann Quealy ("Georgeann") and Brian Quealy ("Brian" and together with Georgeann, the "Quealys") purchased WWW from the Palmers in September of 2005. Primarque and WWW began their relationship in 1976.

As a distributor, Primarque purchased and resold WWW's soup base products. Primarque was authorized to resell the soup base to third parties under its private label "Primarque" and under WWW's label, "Cook's Delight." As to the soup base it prepared for Primarque's private label, WWW would affix Primarque labels on the containers of soup base before shipment. Primarque at no time had any ownership interest in any of WWW's proprietary formulas or in WWW.  Primarque sold WWW's products under Primarque's private label. Primarque would order product from WWW via purchase orders, and WWW would deliver that product to Primarque or its designated recipients. Primarque would then pay the invoiced amount for the product to WWW.

---

[1] In its Counterclaim, WWW asserts a claim against Primarque for breach of contract as the result of Primarque's failure to pay for goods that had been delivered.  Primarque's "defense" to WWW's Counterclaim is that such amount should offset any amounts awarded to Primarque on its claims. A protracted discussion is not warranted. Primarque has essentially conceded that it received the goods in question from WWW and has not asserted any viable defense which would excuse it from having to pay for those goods. Summary judgment shall enter for WWW on its Counterclaim in the amount of $97,843.22, plus prejudgment interest.

WWW and Primarque entered into two distributor/supplier agreements, one in 1987("1987 Agreement") and the other in 1990 ("1990 Agreement" and, together with the 1987 Agreement, the "Agreements").  The Agreements each had three year terms and the parties did not enter into a new agreement after the 1990 Agreement expired. Dorothy decided not to enter into a new agreement in 1993 in order to provide flexibility for WWW to work with other distributors in the New England area.  From June 30, 1993 until WWW officially ended its relationship with Primarque on March 12, 2015 (the "End Date"), the parties maintained an order-by-order, at-will relationship. That is, their distribution arrangements were defined by written purchase orders and invoices, which established the type of product ordered, quantity of product ordered, cost of product, method of shipping and the location to which the product was to be delivered. Primarque was not obligated to buy its soup base exclusively from WWW. WWW was aware that Primarque purchased soup base from other suppliers.

*Primarque Requests the Drop Ship Arrangement*

At different points in time in the parties' relationship, Primarque asked WWW to ship soup base products directly to certain customers ("Drop Ship Arrangement"). This allowed Primarque to avoid having to receive, store, refrigerate, and then re-ship product to the end customer. The customers to which Primarque asked WWW to ship directly are referred to as the Drop Ship Customers and included:  Plenus Group, Inc. ("Plenus"), Rana Meal Solutions, LLC ("Rana"), Whole Foods Kitchen ("Whole Foods"), Blount Fine Foods ("Blount"), Joseph's Gourmet Pasta ("Joseph's"),  Nestle U.S.A. ("Nestle"), Southern New England Spice Company ("Southern New England Spice"), Shaw's Southern Belle ("Shaw's"),  Meritage Soups, LLC ("Meritage"), West Valley  Inn, Inland Market Premium Foods ("Inland Foods"), Ivars, Greencore,  Ian's Natural Foods, Meninno Brothers, Boston Salads, Cape Cod Chowder,

Cameron's Seafood Market, Legal Seafoods, Newbridge on the Charles ("Newbridge"), Elevation Brands, Foxwood Casino and The Crab Trap. The Drop Ship Customers advertised and also presented at food shows and trade shows; the suppliers, including WWW, were aware of these customers. The Drop Ship Arrangement saved Primarque time and resources.    For example, the Drop Ship Arrangement allowed Primarque's pricing to be more competitive. Primarque shared it pricing for its Drop Ship Customers with WWW.  Moreover, with respect to Plenus, up until the late summer/early fall of 2014, Primarque arranged for Plenus to submit its Primarque purchase orders directly to WWW.

*The Purported Oral Agreements with WWW's Prior and Current Owners; The Non-Solicitation Agreement and Agreement to Provide Notice of Termination*.

Barron alleges that he entered into an oral non-solicitation agreement of unlimited duration and scope with Dorothy while she was operating WWW. More specifically, according to Primarque Dorothy agreed that in order to facilitate the Drop Ship Arrangement, if Primarque disclosed the identity and purchase needs of a Drop Ship Customer to WWW and Primarque bought its soup base for that customer from WWW, WWW would neither solicit business from the customer, nor sell its soup base to that customer (whether by initiating the sale, or being solicited by the customer), except through Primarque. Based on this promise, Barron disclosed the name and purchase needs of the Drop Ship Customers to WWW. Dorothy denies ever having entered into an oral agreement with Barron and/or Primarque. Also, according to Primarque, when the Quealys took over WWW, they assured Primarque that none of WWW's agreements with it would change, and all arrangements for doing business together would remain the same. Both Georgeann and Dorothy have testified that the Quealys did not purchase WWW subject to any agreements or obligations with regard to Primarque.

While WWW sales staff were generally not aware of the identity of Primarque's customers who received their goods from WWW's warehouse, they were aware of the identity of the Drop Ship Customers.

WWW kept track of which customers were Primarque's customers, and which were WWW's customers, and made sure that Primarque was not selling to WWW's preexisting customers. At the same time, during the period that Primarque served as a WWW distributor, WWW employees never solicited business directly from Primarque customers. Thus, if any Primarque customer contacted WWW seeking to purchase soup base directly from WWW, WWW did not accept the business and referred the customer back to Primarque. Primarque also did not solicit business from customers that had already been buying soup base directly from WWW. If Primarque stopped ordering soup base from WWW for a particular Drop Ship Customer, WWW could then solicit business directly from that customer.

From 1990-93, the parties had a written private label agreement, which included a provision that "[i]n the event of the sale of either company, this Agreement will remain in effect and be binding on either or both successor owners for a period of one year from the date of sale." The parties did not renew the agreement after 1993. According to Primarque, Dorothy orally agreed that if WWW intended to sell its business to a third party or to close the business, WWW would give Primarque one year notice.

Barron also alleges that he entered into an oral agreement with Georgeann when she and Brian purchased WWW in 2005. According to Barron, the purported oral agreement included a non-solicitation agreement of unlimited duration and scope with an alleged obligation for WWW to provide 90-days' notice if it closed or if the business was sold. Barron testified that he and Georgeann entered into the purported oral agreement on a phone call in 2005, but cannot

articulate the specifics surrounding the alleged call.  Georgeann denies entering into such an

agreement. Primarque has described at least three different versions of the alleged oral agreement

between it and WWW's current owners:

> First, in the Amended Complaint, Primarque alleges that WWW was
> obligated to provide Primarque 90-days' notice [to allow for Primarque to secure
> substitute manufacturers] and to refrain from doing business directly with
> Primarque's customers, indefinitely, provided that  Primarque sold exclusively
> WWW products through Primarque's private label in New England.

> Second, Barron testified that WWW was obligated to provide Primarque
> 90- days' notice if WWW sold or closed its business, and to refrain from selling
> directly to the Drop Ship Customers, indefinitely, provided that Primarque
> provided WWW 90-days' notice if Primarque transitioned customers to another
> supplier.

> Third, in its Response to Request for Admission ("RFA") No. 15,
> Primarque alleges that the purported non-solicitation agreement required WWW
> "not to sell directly to any Primarque customer provided Primarque was selling
> WWW products to that customer."

Barron also testified that he could not articulate how Primarque's transition of business from

WWW to other soup base suppliers would affect WWW's alleged non-solicitation obligation.

Barron repeated the third version of the alleged agreement in his deposition, but limited

WWW's alleged non-solicitation obligation only to the Drop Ship Customers. He testified that

the alleged non-solicitation agreement required WWW not to sell directly to any Drop

Ship Customers provided Primarque was selling WWW products to the Drop Ship Customers.

Barron further testified that WWW's obligation under the oral agreement to provide Primarque

90-days' notice was contingent on WWW selling or closing its business. Barron testified that the

parties never discussed and never agreed that WWW was required to provide Primarque 90-

days' notice if the relationship soured and WWW decided to end its relationship with Primarque.

Specifically, Barron testified as follows:

Q. [F]rom your recollection, a minimum of 90 days' notice of what occurrence?

A. If they [WWW] sold the business, closed the business, stopped selling to Primarque.

Q. And specifically that was discussed, stop selling to Primarque?

A. No. In essence, stopping to do business with Primarque based on closing the business or selling.

Q. Okay. Because that's what all the e-mails include, correct, and we're going to go through those?

A. I don't know. But it was about stopping to sell Primarque, whether through a closing or a sale .....

Q. There wasn't any discussion about the relationship souring...?

A. No, there was no discussion of the relationship souring.

The Court asked Primarque's counsel to explain the alleged oral agreement during a hearing on October 11, 2016. Primarque's counsel explained the agreement as follows: "WWW was to provide Primarque 90-days' notice if it ended its relationship with Primarque and refrain from ever selling to the Drop Ship Customers; provided Primarque sold exclusively WWW products to the Drop Ship Customers." According to Primarque's counsel, if Primarque sold other competitors' products to the Drop Ship Customers, WWW was "off the hook" in terms of its obligations under the purported agreement.

In its statement of material facts, Primarque offers yet another version of the agreement. Primarque asserts that in 2009, while staffing the Boston Seafood Show together, Barron and Georgeann discussed whether their children would eventually take over ownership and operation of their respective companies and discussed how long the Primarque and WWW business relationship would continue. According to Primarque, Georgeann assured Barron that WWW intended to do business with Primarque indefinitely, and that if WWW was ever sold to a third party or WWW otherwise intended to cease doing business with Primarque, WWW would give Primarque at least ninety (90) days' notice.

7

_Primarque Requests WWW to Enter Into a New Agreement_

On September 23, 2009, Barron sent an e-mail to WWW including the following

language about an agreement Barron was proposing to WWW:

> Primarque wants to be given a 1 year notice in the event WWW wants to
> discontinue selling private label products or primarques (sic) customer label
> products to Primarque and Primarque is willing to give WWW one year notice
> should they [Primarque] seek to have their soup bases manufactured by a
> company other than WWW. It is further understood that should a current
> customer try to circumvent Primarque and go directly to WWW this may only be
> done with permission of Primarque. This agreement includes any future owners of
> either company ...This is just a sketch but this is the kind of agreement I had in
> mind - let me know what you think.

Georgeann responded to Primarque's e-mail request on November 24, 2009, and attached

WWW's former attorneys' e-mail advising WWW to refuse Primarque's request. She informed

Barron that WWW agreed with its attorney's advice and would not enter into the agreement

proposed by Primarque. WWW's former attorney advised WWW to refuse Primarque's request

for an agreement for the following reasons: (1) the issue of a one year notice imposed too

significant a burden on WWW and offered nothing on the backside, as Primarque is not capable

of binding Nestle, Heinz etc. to any such commitment, (2) it ignored issues like failures to timely

pay invoices, which would obligate WWW to downstream problems, and (3) the non-circumvent

language was problematic as it would eliminate WWW's ability to compete in an already

competitive marketplace.

Barron responded to Georgeann's November 24, 2009 e-mail the next day, on November

25, 2009, conceding that his non-solicitation/non-circumvention request was a non-starter and

asked Primarque and WWW to "concentrate on just the 1 year notification" if WWW sold its

business. Barron wrote:

> "[T]hank you for getting back to me - can we concentrate on just the 1 year
> notification. If you sell the business I don't want the new owner to tell me that
> they are dropping us in a week ...Soup base is a large part of Primarque's business

and we love working with you, but things can and do happen and we need some kind of protect ion from unplanned and planned events. Please advise and have a great Holiday

-jack

Later, in May of 2010, Primarque again requested WWW to enter into an agreement whereby WWW would provide Primarque notice if it were to sell its business, and bind any future purchaser to continue selling product to Primarque. On May 8, 2010, Primarque sent the following e-mail to Georgeann: "Georgeann - Has your lawyer clarified the protection we were looking for?? I mentioned to Brian we wanted some kind of reassurance that if WWW was purchased by another group or company that they could not immediately get rid of Primarque …" WWW again refused. More specifically, Georgeann responded on May 10, 2010, reiterating that WWW would follow its attorney's advice and again declined Primarque's request to enter into an agreement:

Hi Jack, I am out of town right now but I think we discussed this in December when we were working with our attorney on the agreement you requested. He told us in the event we sell the company, we can only encourage the new owner to keep our customers. As I mentioned earlier, we are investing a substantial amount of money in a new facility and have no plans to sell the business.

Barron responded to Georgeann on May 10, 2010: "[t]hank you - I'll get back to you when I know something that I can bring to the table." Primarque admits the parties never entered into the written agreements Primarque proposed in 2009 and 2010.

### *Custom Soup Bases*

In 2014, Primarque sold approximately fifty-one (51) different soup bases. Primarque's customers fell into two different categories. The first category included small quantity consumers who generally bought soup base for their use and consumption at their place of business, for example, restaurants and institutions with cafeterias. The second category were large industrial customers who ordered quantities in greater than 1,000 pounds, and who generally used the soup

base to manufacture soup or other food products which were sold to others. The soup bases Primarque sold to its Drop Ship Customers such as Blount, Joseph's, Rana, Nestle, Meritage, Plenus, and Southern New England Spice were almost exclusively customized products that had been developed for those customers.

The process to develop a new soup base, or to modify an existing soup base, is a multi-step process involving: (1) learning the customer's need, (2) identifying and obtaining all ingredients (some of which may be specialized), (3) formulating the soup base, (4) having the customer taste and inspect the beta product, and thereafter, repeated reformulation and retesting of the product until the customer is satisfied, 5) creating an ingredients label, (6) obtaining government approval for soup bases containing meat or poultry, (7) obtaining ingredients for full production, and (8) shipment. Additionally, United States Food and Drug Administration laws and regulations require that food ingredients be listed on packaging in order of descending prominence by weight. Changes to ingredients can require that labels be re-submitted to the Government for approval. Most of Primarque's large, industrial customers had ingredient labels made based on the types and quantities of ingredients in the soup base that WWW had developed for Primarque. Therefore, it is an expensive and lengthy (up to 3-4 months) process for a manufacturer to customize a soup base for customers. In 2014, WWW began charging distributors $10,000 to develop a customized product.

### The Parties' Relationship Sours

In late 2013, WWW engaged independent contractor Joanne Tica Steiger ("Tica Steiger") to serve as its sales director, to work with existing customers, and to develop strategic plans. As part of the transition to sales director, Tica Steiger was assigned to manage several of WWW's accounts. In April 2014, WWW assigned Tica Steiger as Primarque's account manager and

primary contact. On April 30, 2014, Brian, Barron, and Tica Steiger held a conference call. According to Brian and Tica Steiger, Barron raised his voice at Tica Steiger on the call and called her incompetent. Furthermore, Brian testified that Barron acted "belligerently" and "unprofessionally" towards Tica Steiger on the call and he was offended by Barron's behavior. Notwithstanding the April 30, 2014 conference call, Tica Steiger assured Brian she could manage the Primarque account[2].

Bernie Zitofsky ("Zitofsky"), a former Primarque employee, testified that Barron said disparaging things about Tica Steiger. Barron has acknowledged that he did not care for her and had made disparaging comments about her. On August 18, 2014, Barron wrote an e-mail to former WWW employee Peter Hargarten ("Hargarten")[3] and in that e-mail Barron referred to Tica Steiger as "useless," and a "bad manager and very bad salesperson." To avoid speaking with Tica Steiger, Barron began to pressure other WWW employees to perform tasks outside of their assigned roles. Hope Gust, a WWW employee, testified that she was afraid to answer the phones when Barron called because of the tension Barron was causing and her perceived harassment.

At the Boston Seafood Show in March 2013, Georgeann and Barron had a dispute concerning WWW's soliciting direct business from DOT Foods, a national food distributor, after Barron had initiated contact with DOT Foods at that show about buying soup base products from Primarque. Barron also wrote out a list of things that he wanted Georgeann to do for Primarque's marketing for the 2014 Boston Seafood Show.

---

[2] In its Statement of Material Facts, Primarque state that prior to having any dealings with Barron, Tica Steiger had referred to him in an internal e-mail as "jackass" and expressed a reluctance to work with him. Since Primarque acknowledges that Barron was not aware of these comments, it is unclear as to how the comments excuse his treatment of Tica Steiger.

[3] Hargarten was employed by WWW from 2004 to October 2013, serving in various roles, including plant manager. His responsibilities included acting as customer service representative to Primarque.

In April 2014, Primarque was attempting to land a new customer, "CTG." On April 30, 2014, Brian asked Tica Steiger to assist Barron in answering some questions as to what was meant by various terms, *e.g.*, "MOQ" and a "harmonized tariff." Tica Steiger e-mailed Barron and told him "[t]he government export websites should have all the information that you need for your customer." In a later e-mail, she told him "I am representing the manufacturer and can't advise you on this matter." Barron responded to Brian and Tica Steiger stating that he was confused by Tica Steiger's response and asking who he should seek help from at WWW if Tica Steiger can't advise him. Tica Steiger sent Barron another e-mail stating that while WWW was developing an export platform, it would not be ready for 60-90 days-- as WWW was not currently exporting goods, she didn't understand why he thought WWW would be responsible for developing an export program for Primarque and its customers. Barron responded that he had no questions. Barron found Tica Steiger to be unhelpful and so informed Georgeann. Barron attempted to contact Brian to complain about Tica Steiger, but Brian would not return his calls or texts. After April 30 2014, Brian stopped speaking with Barron. After Tica Steiger was assigned to the Primarque account, Georgeann had no further communication with Barron. Tica Steiger often responded to Barron with contentious e-mails containing sarcastic comments. Neither Brian nor Georgeann attempted to smooth the relationship between Barron and Tica Steiger.

After Tica Steiger came on board, WWW adopted new shipping policies. Some of the new shipping policies resulted in administrative tasks previously handled by WWW being shifted to Primarque. Additionally, prior to April 2014, WWW did not require Primarque to make any minimum orders for soup bases, with the exception of requiring minimum orders of 300 pounds for non-stock items such as lobster base and low sodium products. As of May 1, 2014, WWW required Primarque to make a minimum order of 2,000 pounds for non-stock item

soup base.  Moreover, prior to April 2014, WWW had never charged Primarque a fee for providing research and development services in connection with developing customized soup base products.  On May 4, 2014, WWW advised Primarque that going forward, the terms for developing a custom formulated soup base would be a minimum 20,000 pound annual order of the custom base, plus, as noted previously, a $10,000 non-refundable charge to cover development costs.  WWW also advised Primarque that these terms were non-negotiable. Finally, before June 3, 2014, WWW never charged Primarque for providing samples of its soup base and paid the cost of shipping the samples.  Primarque was informed that as of that date, if it wanted a sample sent to one of its customers and the customer ordered 300 pounds, Primarque would be billed for the 1,000 pound minimum.

Zitofsky, an independent contractor who worked with Primarque, researched Tica Steiger's background and found that she had worked for Goldman Sachs as an investment banker.  From this information, Zitofsky concluded that Goldman Sachs, or another financial company with whom Tica Steiger could be associated now owned WWW and was restructuring the company to straighten out its finances.  Zitofsky shared this insight with Barron. Barron then determined to start working with other suppliers.

During the period from June to October 2014, three containers of soup base that Primarque purchased from WWW for its customers were found to contain foreign matter. More specifically: a shipment to Blount contained a piece of plastic; a shipment to Newbridge contained a glove; and shipment to Southern New England Spice contained a hair. These incidents are the first time in the parties' twenty-eight year history that any foreign matter was found in product produced by WWW for Primarque customers.

In May of 2014, ten months before the End Date, Primarque met with WWW's competitors about supplying soup bases to replace the products Primarque was selling that were made by WWW. Barron admits that Primarque started moving product away from WWW in May 2014, and that it did not give notice to WWW before it began purchasing soup base products from different soup base manufacturers and selling it to customers to whom Primarque formerly sold WWW's soup base products. Further, Primarque admits that it "began selling soup bases from suppliers other than WWW to the Drop Ship Customers prior to March 12, 2015," and did not provide WWW notice before doing so. Although WWW was unaware of Primarque's plans to leave WWW and work exclusively with other suppliers, Hargarten, with whom Barron kept in touch via, among other methods, blind copying him on e-mails to WWW, testified that he was aware that Primarque was already working with other soup base suppliers in 2014, was in the process of "switching to a different soup base supplier or suppliers in August of 2014," and intended to sell other soup base suppliers' products under the Primarque private label after Barron transferred his business from WWW to other suppliers.

On June 16, 2014, nine months before the End Date, Primarque entered into a Memorandum of Understanding with Major Foods ("Majors") whereby Majors would begin supplying soup base Products for Primarque to sell to its customers. On August 5, 2014, Primarque entered into a Memorandum of Understanding with WWW competitor Eatem, whereby Eatem would begin supplying soup base Products for Primarque to sell to its customers. On September 5, 2014, seven months before the End Date, Barron e-mailed Todd Anderson ("Anderson") of Majors and ordered a mushroom soup base to sell to Whole Foods (a Drop Ship Customer), under the Primarque private label. By October 2, 2014, six months before the End

14

Date, Primarque had purchased $67,000 worth of soup bases from Majors, and Barron had informed Majors that he had pretty much cut off his ties with WWW so that Majors was his primary soup base supplier. Barron confirmed at his deposition that in October 2014, he was talking to Anderson about sending a vegetable base to Whole Foods and moving that business from WWW to Majors. Baron also acknowledged that he did not notify WWW that he was moving the Whole Foods' account to a competitor.

WWW changed the formulation of its lobster soup base to include salmon. Rana was not happy that ingredient change because it impacted its labeling. For that reason, Primarque in 2014 sought to have the lobster soup base WWW had previously sold Primarque duplicated. Moreover, with respect to any Drop Ship Customer supplied by WWW that Barron wanted to replace with another supplier, it would be necessary to replicate the soup base as close as possible in order to avoid having to submit new ingredients labels to the government for approval.

With respect to warehouse customers who did not purchase custom orders, the soup bases which Barron hoped to get from other suppliers did not have to be duplicates of the soup bases produced by WWW, as these customers did not have ingredient labeling or government approval concerns. Nonetheless, Barron wanted the replacement soup bases to be equal to, or better, than those he was purchasing from WWW. To entice Majors and Eatem to develop potential soup base products for Primarque, Barron shifted some WWW warehouse business to them. Primarque purchased approximately $135,833.93 in soup base products from Majors and Eatem in 2014 (this figure does not include soup base that Primarque had been purchasing from Majors for a lengthy period of time).

On Nov. 11, 2014, four months before the End Date, in a series of e-mails among Barron, Mark Mason ("Mason") of Eatem, and Mythili Kotapalli of Rana (a Drop Ship Customer), Barron forwarded an e-mail from Rana with the subject line "PO (Purchase Order) and Rana approval for the Eatem manf. Plant for the primarque lobster base." Barron asked Mason for some additional information for Rana about the "824 Lobster Base you (Eatem) are producing for us"-- Eatem was asked to copy the lobster base from WWW that Primarque was now selling to Rana. On December 8, 2014, three months before the End Date, Eatem filled an order for Primarque to send soup base to Drop Ship Customer, The Crab Trap. On January 7, 2015, two months before the End Date, Mason sent an internal e-mail about a Primarque purchase order and confirmed that Primarque was transitioning more business from WWW to Eatem. Mason wrote: "[t]his is the first order going to this customer since they converted to Eatem from [WWW]." On June 6-8, 2014, Primarque instructed Eatem that it must use its private label to package the clam bases it was making for Primarque. Eatem assured Primarque it was no problem to package the soup bases using Primarque's private label.

After signing the Memorandums of Understanding, and months before the End Date, Primarque worked with Majors and Eatem to replicate WWW's products, create replacement products, and transition customer business to Majors/Eatem. Primarque admits that Majors/Eatem developed replacements for WWW soup base products for Primarque to sell to certain Drop Ship Customers prior to the End Date. Prior to the End Date, Primarque also worked with suppliers who were WWW competitors to create substitute or replacement products to sell in place of WWW's products. For example, Barron asked Eatem to duplicate soup bases that Primarque had been purchasing from WWW/ prior to the End Date. Barron stated at his deposition that:

A. For every one of the products I was purchasing from WWW, I wanted either to have a replication in place or a duplication in place ...

Q. But you weren't just keeping those replacement products as backups, you were already selling those products?

A. Yes, you've got to sell them to see how they perform.

On May 14, 2014, approximately a month before Primarque signed its contract to purchase soup base products from Majors, Anderson e-mailed Jack Barron about "matching" certain WWW soup bases Primarque had been selling. Anderson wrote that if Majors did not have an existing suitable match in stock, Majors may have to "replicate your current [WWW] products ..."  On June 2, 2014, Mason e-mailed Barron and wrote "I will get the sample of your [WWW's] supreme chicken base to our tech guys to see how easily, and quickly, they can match it for you."

On August 18, 2014, seven months before the End Date, Hargarten e-mailed Barron and asked if Primarque had "all of [WWW's] products matched yet," in order to sell under the Primarque private label.  Barron responded that "most of the major stuff has been replaced," and he was working on replacing the products for the Drop Ship Customers.  On September 5, 2014, Anderson e-mailed Allen Mok (also of Majors) and Barron, and described his efforts to match a chicken base that Primarque had been purchasing from WWW. Anderson wrote that he compared "both products side- by-side" and that "the color was dead on...and the flavor profile was very close." Anderson concluded that Majors needs to "work on tightening this product up a little more."

On September 9, 2014, Barron e-mailed John Shaw III ("J. Shaw") of Shaw's (a Drop Ship Customer), and informed him that Primarque would be sending samples of two clam bases, the original WWW-supplied clam base and "[Primarque's] new clam base (that I love)." Barron told J. Shaw that he negotiated a better price for the new clam base. J. Shaw ordered two

cases of Primarque's "new" clam base, but cautioned that he needed the new clam base to match the ingredients of the former clam base (made by WWW), so that Shaw's could continue using the same labels.

On September 18, 2014, Barron e-mailed Majors and wrote in the subject line "Re: a large customer of mine has asked me to see if you can duplicate this [WWW] beef base for me??" Barron emphasized that the new product must be an exact match to WWW's beef base Primarque had been selling under its private label, as the customer did not want to have to change its labels. To assist with the matching process, Barron attached WWW's "Integrative Flavors Ingredient Specification Sheet" to his e-mail. He did so to assist Majors in replicating WWW's products-- having the actual specification sheet makes replicating products significantly easier.

On October 1, 2014, Barron instructed Anderson/Majors to ship a vegetable soup base to Whole Foods until the vegetable soup base Majors was replicating from the WWW vegetable base was ready. Barron told Anderson that "[Whole Foods] will not refuse it [the temporary replacement vegetable base] but I've been waiting patiently since June for the Veg base-I want to move these customers your way-either I [substitute] with your current stuff or continue with the old supplier [WWW], who I do not want to reward with business --- Jack" Barron did not want to send WWW any more business, and therefore, transitioned Whole Foods to Majors in October of 2014 (five months before the End Date) without notifying WWW.

On October 15, 2014, five months prior to the End Date, Anderson completed and sent to Majors' Research and Development Department a "New Product Research and Development Form" and described how Primarque was requesting an "exact match" of WWW's beef soup base. He attached the "Integrative Flavors Ingredient Specification Sheet for Beef Soup Base"

18

that Barron had previously sent to him. On November 5, 2014, Anderson wrote to his colleagues at Majors and thanked them for their hard work replicating certain WWW soup bases. Specifically, Anderson wrote: "I know Jack (Barron) can be a pain at times but the good news is the probability of getting business is 100% on items that we are matching from Integrative Flavors."

Barron admits that he obtained information about WWW's proprietary formulas from Hargarten, a former WWW employee, and shared that proprietary information with suppliers who are competitors of WWW. For example, Hargarten shared that the chicken base that WWW had manufactured for the Primarque private label used powder turmeric, not oleoresin turmeric. Barron shared that with Majors to help them better replicate that soup base product so he could sell it to other customers. Barron first testified during his deposition that Primarque did not take steps to conceal the fact that it was replicating WWW's products and transitioning business from WWW to its competitors. In fact, Barron indicated that he wanted WWW to know that he was replicating its products. However, on May 30, 2014, Barron e-mailed J. Shaw regarding supplying a new shrimp base to Shaws. Barron informed J. Shaw that Primarque would have a new shrimp base available to sell him shortly, but that he should "keep the E-Mails between you and me - no copies - this is from another soup base mixer [soup base supplier] and I don't want to create issues with the Indiana people [WWW]." Barron acknowledged that he did not want to leave a paper trail about transitioning to a new supplier.

Primarque was WWW's largest purchaser of soup base, accounting for about eighty percent (80 %) in terms of production and sixty percent (60 %) in terms of volume of the soup base manufactured by WWW. In calendar year 2013, Primarque purchased approximately $1,254,674.56 worth of soup base from WWW. In calendar year 2014, Primarque purchased

approximately $1,313, 175.59 worth of soup base from WWW.[4] During the last monthly period

that WWW sold soup base to Primarque (February 6, 2015 to March 12, 2015), Primarque

purchased $97,843.22 of soup base from WWW. Primarque maintains that it intended to keep

WWW as a supplier and to buy approximately $1,300,000 worth of soup base in the 2015

calendar year.

As early as November 3, 2014, WWW began contemplating the retention of a new

distributor in the New England area. As early as December 2014, without notifying Primarque,

WWW approved a credit account for Blount and sent them product pricing. Also unbeknownst

to Primarque, on December 18, 2014, Tica Steiger offered to have WWW work directly with

Primarque Drop Ship Customer, Ivar's. On March 9, 2015, WWW reviewed its sales numbers

for the first quarter of 2015 and identified certain downward trends related to Primarque's sales:

> • The only top 10 WWW customer that was down in 2015 was Primarque's
> warehouse sales.

> • 8 of WWW's top 20 2014 customers had not ordered in 2015, and of those 8, six
> were Primarque customers.

> • As of March 9, 2015, on a calendar basis, WWW was down 11.04% from the
> same date in 2014.

On March 10, 2015, after reviewing the sales' trends for 2015, WWW sent an e-mail to

Barron asking whether Primarque's sales were down just due to lost business or whether

Primarque had transitioned business from WWW to other soup base suppliers. Barron responded

by writing "A combination of both." On March 12, 2015, WWW sent a letter to Primarque

notifying it that WWW was ending its relationship with Primarque, effective immediately ("End

Letter"). Later that same day, WWW sent letters to certain joint customers informing those

---

[4] The amounts included a decrease in purchases to warehouse customers of about $20,000, with an increase
of about $100,000 to Drop Ship Customers, so that Primarque increased its overall purchase of soup base from
2013-14 by about $80,000.

customers that Primarque was no longer distributing WWW's soup base products ("Notification Letter"). The Notification Letter did not disparage Primarque, nor did it explain why Primarque was no longer distributing WWW's products. The letter notified customers that they could now obtain their soup base directly from WWW and would receive pricing at lower direct rates.

WWW did not sell any soup base to any of the Drop Ship Customers or any other Primarque customer until after it ended its relationship with Primarque and discontinued supplying soup bases for Primarque to sell to those customers. After WWW sent the End Letter and Notification Letters, Primarque e-mailed Drop Ship Customer Meritage Soups and stated that WWW had ended its relationship with Primarque and had "taken [Primarque's] recipes and copied them." However, Primarque at no time had any ownership interest in any WWW proprietary formulas. On the contrary, Primarque was merely a distributor who passed along feedback from customers about WWW's soup bases. Barron admits that his statement about WWW "stealing" Primarque's recipes and copying them may not be considered "totally accurate."

Primarque claims that it required 90-days' notice to secure substitute suppliers, and that because it did not receive notice of the termination of this distribution agreement, it was unable to immediately obtain a substitute supplier. However, by August 2014, Primarque had secured Majors and Eatem, two substitute suppliers-- seven months prior to the End Date. In fact, Primarque had worked with those substitute suppliers to replicate or match WWW's products to create replacement products for Primarque, prior to the End Date.

Primarque did not have contracts with its customers and could not commit to a minimum order to secure a consistent price for product. On September 25, 2014, WWW offered to give Primarque some protection by establishing a one-year fixed price if Primarque could commit to a

standing monthly order. Barron responded by explaining that, because Primarque had no contracts with its customers, it could not take advantage of WWW's price-fix offer. Moreover, Barron had confirmed that he could not commit to a minimum monthly order because he had no way to bind customers to monthly orders. Barron has also confirmed that he had no contracts with any of his customers, including the Drop Ship Customers, with the exception of a one-year price freeze with Nestles. Barron also acknowledges that prior to the End Date, Primarque's relationship with certain Drop Ship Customers, particularly its largest customer, Blount, was strained. In an April 6, 2009 e-mail, Barron wrote to WWW that Blount's purchasing director was "very chilly" when Barron showed up at Blount's facilities.

Primarque lost the soup base business of seven of its Drop Ship Customers to WWW: Blount, Plenus, Joseph's, Rana, Nestle, Meritage, and Southern New England Spice. Primarque seeks seven years of consistent distributor profits based on sales to eight Drop Ship Customers: Meritage, Inland Foods, Blount, Nestles, Rana, Joseph's, Plenus and Southern New England Spice ("Damages Customers"). It has mitigated its damages by reacquiring business from several of the Damages Customers, including Plenus, Joseph's, and Rana, and continues to make efforts to regain soup base business from the Damages Customers.[5]

---

[5] In its statement of facts, Primarque has produced a series of e-mails from Tica Steiger to two Drop Ship Customers, Blount and Plenus. Primarque was not aware of these e-mails at the time they were sent. Primarque characterizes these e-mails as Tica Steiger criticizing Primarque to its customers. First, since Primarque was not aware of the e-mails at or around the time they were sent, it has failed to establish their relevance to its claims. Second, Primarque's mischaracterizes the nature of the e-mails. It is clear that Tica Steiger is responding to complaints and inquiries directed to her from Primarque's customers *about Primarque*. While one of the responses to Blount can be characterized as critical of Primarque's performance, it is clear from the context that the vast majority of her responses note that Primarque was responsible for getting back to the customer or would have the requested information. Simply put, these e-mails do not advance any claims asserted by Primarque.

## **Discussion**

### *Summary Judgment Standard*

Summary judgment shall be granted if the moving party shows, based on the materials in the record, "that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute precludes summary judgment if it is both "genuine" and "material." *See Anderson v. Liberty Lobby*, 477 U.S. 242, 247-48, 106 S.Ct. 2505 (1986). An issue is "genuine" when the evidence is such that a reasonable factfinder could resolve the point in favor of the non-moving party. *Morris v. Gov't Dev. Bank*, 27 F.3d 746, 748 (1st Cir. 1994). A fact is "material" when it might affect the outcome of the suit under the applicable law. *Id*.

The moving party is responsible for "identifying those portions [of the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548 (1968). It can meet this burden either by "offering evidence to disprove an element of the plaintiff's case or by demonstrating an 'absence of evidence to support the non-moving party's case.'" *Rakes v. U.S.*, 352 F. Supp. 2d 47, 52 (D.Mass. 2005) (quoting *Celotex*, 477 U.S. at 4). Once the moving party shows the absence of any disputed material fact, the burden shifts to the non-moving party to place at least one material fact into dispute. *See Mendes v. Medtronic, Inc.*, 18 F.3d 13, 15 (1st Cir. 1994) (discussing *Celotex*, 477 U.S. at 325). When ruling on a motion for summary judgment, "the court must view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Scanlon v. Dep't of Army*, 277 F.3d 598, 600 (1st Cir. 2002).

## The Substance of this Suit and Primarque's Claims

While Primarque attempts to place a different characterizing on the turn of event which led to this action, reading *both* parties' versions of the facts favorably to Primarque *and* making all reasonable inferences, it is clear that in mid to late 2014, Primarque determined to move its soup base product purchasing away from WWW to different suppliers.   It did so because Barron did not like personnel changes at WWW, in particular, Tica Steiger and because he did not like new policies being implemented by WWW. He also had some concerns about WWW's financial stability based on information provided to him by a former WWW employee (Hargarten) and the speculation of a third party consultant (Zitofsky).  WWW became aware that Primarque had begun to shift business to other suppliers and abruptly terminated the parties' relationship.

Primarque seeks to hold WWW liable for terminating the relationship without providing 90 days' notice, and for subsequently soliciting customers for whom WWW had produced soup base products on behalf of Primarque.  Significantly, the parties had no written contract which required advance termination notice, and had no written non-solicitation agreement.  In fact, both the current and former owners of WWW had adamantly refused entering into any such agreements. Primarque's claims are based on Barron's contention that the parties had oral agreements whereby: (1) WWW would give 90 days' notice if it intended to terminate the relationship, and (1) WWW would not solicit business from any Drop Ship Customer, nor sell its soup base to any such customer (whether by initiating the sale, or being solicited by the customer), except through Primarque.  However, the details of these alleged agreements are somewhat amorphous and Barron has provided different interpretations of the terms of the alleged oral agreements.  In any event, the Quealys and Dorothy denied making any such oral

agreements with Barron. With this background in mind, I will address WWW's motion for summary judgment.

Breach of Contract

Primarque asserts that WWW had made oral promises to: (1) provide ninety (90) days' notice in connection with any termination that would result in the disruption of supply for Primarque's customers; and (2) not to solicit business directly from Primarque's customers whose identities Primarque had previously disclosed to WWW, and who had previously done business with WWW. Primarque further asserts that it relied on WWW's oral promises and continued to order substantial quantities of product to supply its customers and continued to exclusively market and sell the WWW product under its private label. Primarque alleges that WWW breached its promises by: (1) terminating their arrangement without notice; and (2) soliciting Primarque's longstanding customers to purchase soup based products directly from WWW, circumventing Primarque as the distributor.

*Failure to Provide Notice of Termination*

"To recover damages in a breach of contract claim, the plaintiff must prove the existence of a valid binding agreement, the defendant's breach thereof, and damages resulting from the breach. To create an enforceable contract, the parties must agree on material terms and manifest a present intention to be bound by the agreement. Thus, the parties must mutually assent to bind themselves to the agreement and the contract'' essential terms must be sufficiently definite so that the nature and extent of the obligations of the parties are ascertainable. *Boyle v. Douglas Dynamics, LLC,* 292 F. Supp. 2d 198, 208 (D. Mass. 2003), *aff'd,* 99 F. App'x 243 (1st Cir. 2004)(internal citations, internal quotation marks and citation to quoted cases omitted). Additionally, under Massachusetts law, distributorship agreements which do not expressly agree

to a durational term are terminable at will by either party upon reasonable notice. *Serpa Corp. v. McWane, Inc.*, 199 F.3d 6, 14 (1st Cir. 1999)(citing *Teitelbaum v. Hallmark Cards Inc.*, 25 Mass. App.Ct. 555, 520 N.E.2d 1333 (1988)). Moreover, "the reasonableness of the notice 'is measured in terms of the ability of the party affected by the termination to obtain a substitute arrangement.'" *Id.* (citing *Teitelbaum*, 25 Mass. App Ct. at 555, 520 N.E.2d 1333). Damages in such cases are *limited to the "the time period of what constitutes reasonable notice.*" *RGJ Assocs., Inc. v. Stainsafe, Inc.*, 300 F.Supp.2d 250 (D.Mass. 2004)(emphasis added).

In this case, there is no dispute that the parties did not have a written agreement and while they continued to do business together, there was no set duration for their arrangement. Primarque contends that WWW orally promised to give 90 days' notice of its intent to end the parties' distributorship arrangement. At no time does Primarque suggest that the notice provision was mutual, that is, Primarque apparently retained the right to terminate its arrangement with WWW without notice. It is not for this Court to decide issues of credibility at summary judgment and therefore, I will assume that an oral promise was made. However, even if I assume that some kind of promise was made, Primarque itself cannot define the terms of the agreement. At times, the terms suggest that notice was required only if WWW were sold or closing. At other times, Primarque suggests that the notice was required if WWW intended to stop supplying product to it. Under these circumstances, no reasonable jury could find that there was an enforceable oral agreement by WWW to provide 90 days' notice to Primarque before it terminated their arrangement. At the same time, Massachusetts law would still require WWW to provide Primarque with reasonable notice of its intent to terminate the parties' distributorship arrangement— a requirement that would apply equally to Primarque, that is, Primarque was required to have given WWW reasonable notice if it intended to end the arrangement. Moreover,

there is a disputed issue of material fact as to who breached the contract in the first instance—did

Primarque breach the contract by surreptitiously moving business to other suppliers and/or

attempting to replicate WWW's soup bases?[6] Or, did WWW breach the contract by abruptly

terminating the distributorship agreement without giving Primarque reasonable notice, that is,

sufficient notice for Primarque to obtain a substitute supplier. Therefore, WWW's motion for

summary judgment is denied with respect to this claim.

*Breach of the Alleged Non-Solicitation Agreement*

Primarque alleges that the parties had an oral non-solicitation agreement whereby WWW

would indefinitely refrain from doing business directly with Primarque's customers.

Massachusetts courts have imposed restrictions on the enforcement of agreements not to

compete: "In deciding whether to enforce a particular agreement, a court should consider if the

covenant (1) is necessary to protect the legitimate business interest of the party seeking to

enforce it, (2) is supported by consideration, (3) is reasonably limited in all circumstances,

including time and space, and (4) is otherwise consonant with public policy." *IKON Office Sols.,*

*Inc. v. Belanger*, 59 F. Supp. 2d 125, 128 (D.Mass. 1999).

The problems with this claim are myriad. First, Primarque relies on an alleged oral non-

solicitation agreement made with Dorothy, the former owner of WWW in the late 1980s.

Dorothy allegedly promised not to solicit business from Primarque Drop Ship customers, nor to

sell soup base to that Primarque customer except through Primarque (one iteration of what

---

[6] Under Massachusetts law, there exists an implied covenant of good faith and fair dealing implicit in every contract. "The covenant provides that 'neither party shall do anything that will have the effect of destroying or injuring the rights of the other party to receive the fruits of the contract.' The implied covenant may not, however, be invoked to create rights and duties not contemplated by the provisions of the contract or the contractual relationship." *Robert Reiser & Co. v. Scriven*, 130 F. Supp. 3d 488, 495 (D. Mass. 2015)(internal citations and citation to quoted case omitted). Actions which may not breach an explicit contract provision may still breach the implied covenant of good faith and fair dealing where it was undertaken in bad faith, for example, or otherwise violated public policy.

Primarque contends are the terms of the non-solicitation agreement).  Primarque contends that

when they purchased WWW, Georgeann assured Primarque that none of the parties' agreements

would change.  Yet Barron sent the Quealys multiple e-mails requesting that they enter into a

written non-solicitation agreement. Notably, none of those e-mails makes reference to

Primarque's contention that the parties were already operating under a previously agreed to oral

non-solicitation agreement. Nonetheless, at this stage of the proceeding, I am compelled to

assume the facts in favor of Primarque, *i.e.*, that an oral promise was made. However, this issue

is distinct from the issue of what were the alleged terms of the promise.

Primarque cannot articulate the terms of the alleged oral promise: the only term of the

alleged agreement on which Primarque remains firm is that the term of the non-solicitation

agreement was indefinite, or effectively indefinite (WWW would refrain from selling to certain

customers, so long as Primarque continued to sell to such customers).  However, even taking the

facts in a light most favorable to Primarque, the terms of the alleged non-solicitation agreement

are not clear: did WWW agree to only refrain from dealing with Drop Ship Customers, and if so,

was it only Drop Ship Customers as to who WWW was Primarque's only soup base supplier?

Given that Primarque cannot itself articulate what the terms of the alleged non-solicitation

agreement, a reasonable fact finder could not find that the parties had a meeting of the minds on

this issue. Accordingly, a reasonably factfinder could not, as a matter of law, find that Primarque

can establish the first factor, *i.e.,* the non-solicitation covenant is necessary to protect its

legitimate business interest.

Primarque also cannot establish the third factor, *i.e.,* that is reasonably limited in all

circumstances, including time and space.  The alleged non-solicitation agreement is for an

infinite duration.  Needless to say, Primarque has not, and cannot, as a matter of law, establish

the necessary relation between protecting its business interest and the *indefinite* duration of the non-compete period. *See also Richmond Bros. v. Westinghouse Broad. Co.,* 357 Mass. 106, 110, 256 N.E.2d 304, 307 (1970)(in determining whether restriction as to time is reasonable courts consider the nature of plaintiff's business, situation of parties, necessity of restriction for protection of plaintiff's business and right of defendant to earn livelihood); *cf. Dynamics Research Corp. v. Analytic Scis. Corp.*, 9 Mass. App. Ct. 254, 278, 400 N.E.2d 1274, 1288 n.32 (1980)(suggesting that analysis that could turn a non-disclosure agreement into an "open-ended" non-competition agreement is unenforceable as against public policy). Indeed, Primarque has not suggested how long a period it would be reasonable under the circumstance to restrict WWW's solicitation (assuming there was a promise which defined those customers which it was to refrain from dealing with) in order to protect Primarque's legitimate business interests. For the reasons set forth above, WWW's motion for summary judgment on Primarque's breach of contract claim for violation of the alleged non-solicitation agreement is *granted.*

<u>Promissory Estoppel</u>

"An offer which the offeror should reasonably expect to induce action or forebearance of a substantial character on the part of the offeree before acceptance and which does induce such action or forebearance is binding as an option contract to the extent necessary to avoid injustice." *Loranger Const. Corp. v. E. F. Hauserman Co.*, 376 Mass. 757, 760, 384 N.E.2d 176, 179 (1978)(citation to quoted authority omitted). "Circumstances that may give rise to an estoppel are (1) a representation intended to induce reliance on the part of a person to whom the representation is made; (2) an act or omission by that person in reasonable reliance on the representation; and (3) detriment as a consequence of the act or omission." *Sullivan v. Chief Justice for Admin. & Mgmt. of Trial Court*, 448 Mass. 15, 27–28, 858 N.E.2d 699, 711 (2006). " 'An essential element under

the promissory estoppel theory is that there be an *unambiguous* promise and that the party to whom the promise was made reasonably relied on the representation.' " *Rhode Island Hosp. Tr. Nat. Bank v. Varadian*, 419 Mass. 841, 848, 647 N.E.2d 1174, 1178 (1995)(emphasis added).

I have previously found that Primarque cannot articulate the specific terms of a promise made by WWW with respect to either providing 90 days' prior notice before terminating their arrangement, or with respect to an alleged agreement not to solicit business from Primarque's customers. This finding is fatal to Primarque's promissory estoppel claim. Accordingly, WWW's motion for summary judgment on Count III of Primarque's complaint is *granted*.

<u>Tortious Interference</u>

Primarque has asserted a claim against WWW for tortious interference with advantageous business arrangements. In order to prevail on a claim for tortious interference with an advantageous relationship, a plaintiff must prove the following elements: "(1) a business relationship or contemplated contract of economic benefit; (2) the defendant's knowledge of such relationship; (3) the defendant's intentional and malicious interference with it; (4) the plaintiff's loss of advantage directly resulting from the defendant's conduct." *Welch v. Ciampa*, 542 F.3d 927, 943–44 (1st Cir.2008) (citation to quoted case omitted). Primarque contends that WWW's abrupt termination of the parties' distributorship agreement, which left it no time to secure another supplier, can constitute interference by improper means. Additionally, Primarque contends that WWW surreptitiously disparaged Primarque to its customers and solicited business directly from its customers in violation of the non-solicitation agreement. Primarque also asserts that WWW used its (Primarque's) pricing information that it had received under the protection of the parties' non-solicitation agreement and used the information to undercut Primarque's prices in a direct solicitation from its customers, which constitutes improper means. Primarque further

asserts that the WWW soup bases containing foreign matter which were delivered to Primarque customers was a deliberate attempt by WWW to sabotage its relationship with its customers.

First, I have found that Primarque has failed to establish, as a matter of law, that the parties had a non-solicitation agreement.[7] Additionally, given Primarque's own conduct, I find many of these allegations disingenuous and/or unsupported by the factual record. Nevertheless, as I have previously found, there is a question of fact as to whether WWW improperly terminated the parties' relationship without reasonable notice. If a jury were to find that WWW did so, then it could find that it prematurely contacted Primarque customers and started doing business with them, to the detriment of Primarque. On this record, Primarque faces an uphill battle establishing the requisite improper means or motive on behalf of WWW, *i.e.*, that WWW's alleged interference was intentional and malicious. Nonetheless, I cannot find that WWW is entitled to summary judgment on this claim, as a matter of law. Therefore, I am denying WWW's motion for summary judgment on Count III.

<u>The Chapter 93A Claim</u>

WWW has moved for summary judgment on Primarque Chapter 93A claim for unfair and deceptive business practices. Chapter 93A proscribes "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass.Gen.L., ch. 93A, § 2. A practice is unfair if it falls "within the penumbra of some common-law, statutory, or other established concept of unfairness; is immoral, unethical, oppressive, or unscrupulous; and causes substantial injury to other businessmen." *Linkage Corp. v. Trs. of Boston Univ.*, 425

---

[7] Frankly, Primarque's arguments in support of this claim are a prime example of the problem with its allegation that the parties had a binding non-solicitation agreement. The alleged terms of the non-solicitation agreement it cites to in support of its tortious interference claim are broader than the terms it alleges in support of the non-solicitation agreement itself. In other words, once again Primarque has made clear that it cannot articulate exactly what constituted the terms of the alleged non-solicitation agreement.

Mass. 1, 27, 679 N.E.2d 191 (1997) (internal alterations omitted). Where, as in this case, a business seeks relief under Section 11 for violation of the statute, courts apply "a stricter standard than [it would for individual] consumers in terms of what constitutes unfair or deceptive conduct." *Giuffrida v. High Country Investor, Inc.*, 73 Mass. App. Ct. 225, 238-39, 897 N.E.2d 82 (2008).

Much of the evidence in the record suggests that the parties' dispute stems from nothing more than a failed business relationship due primarily to personality conflicts. On this claim, the only issue presently before me is whether Primarque has established that there is sufficient evidence on the record to go forward with a Chapter 93A claim (WWW has not alleged a Chapter 93A claim against Primarque). Whether an act or practice is "immoral, unethical, oppressive or unscrupulous" is the kind of fact-specific determination generally left for a jury. *See, e.g.*, *First Choice Armor & Equipment, Inc. v. Toyobo America, Inc.*, 839 F. Supp. 2d 407, 415 (D. Mass. 2012) (denying summary judgment on plaintiff's 93A claim "[b]ecause [the unfair or deceptive practice] inquiry is fact-intensive"). However, in this case, Primarque has not come forward with a scintilla of evidence that *WWW* engaged in any unfair, or deceptive act or practice. Because there is no genuine issue of material fact with respect to Primarque's Chapter 93A claim, WWW's motion for summary judgment is granted on Count IV.

## Conclusion

For the foregoing reasons, Defendant/Counter-Claimant Williams West & Witt's Products Company d/b/a Integrative Flavors' Motion for Summary Judgment (Docket No. 129)

is **granted**, as to its Counterclaim, and **granted**, in part, and **denied**, in part as to Plaintiff,

Primarque Products, Co. Inc.'s claims, as provided in this Memorandum of Decision and Order.

**SO ORDERED.**

/s/ *Timothy S. Hillman*
**TIMOTHY S. HILLMAN**
**DISTRICT JUDGE**